Good afternoon, your honors, and may it please the court. Jeff Kelman on behalf of the plaintiffs, counter defendants and appellants, 3500 Sepulveda, 13th and Crest Associates, and 6220 Spring Associates, who I will collectively refer to as the Hacienda parties. With the court's permission, I plan to reserve about seven or eight minutes of my 20 minutes for rebuttal. Okay, please watch the clock. Thank you, Judge Akuda. Your honors, this case is about parking. And REEF does not dispute that it is eliminating critical parking for my clients. My clients own a building in the corner of the Manhattan Village Shopping Center. And their tenants rely on nearby available parking, so that their customers can have that easy in and out experience that they expect from those stores. But as the court has seen, the amount of parking that REEF is eliminating in that corner of the shopping center is staggering. And so what's what's going on right now, with the parking deck construction in Lot F? Judge Bennett, from what I understand, parking has been completely shut off in Lot F because they are building the North Deck right now. So the North Deck construction is still ongoing. That's right, your honor. All right. Thank you. Sorry to interrupt. No problem. In the 2008 settlement agreement, the parties agreed that there would be 620 spaces available in that Lot F area at the end of construction. That would have been a 143 space increase above the 477 that existed in the surface lot pre construction. But the latest site plan in the record from 2016 shows that there will only be 487. And in fact, the latest site plan we know about, the plan that we sought judicial notice of from 2019, calls for only 471 spaces in that Lot F area, an actual loss of spaces than those that existed pre construction. And it's not just a loss of spaces in a vacuum, it's a loss of spaces with a build of new square footage over 100,000 square feet of new leaseable area that will surround that North Deck area, causing a greater demand on those spaces and putting the Hacienda parties in an even worse position when it comes to parking. And as Judge Bennett pointed out, that's not all. In the settlement agreement, REEF also promised to maintain 240 spaces during construction, so that customers of the Hacienda building could still frequent the businesses they love there. But now, REEF is providing zero spaces, it is entirely shut off the Lot F area, violating the agreement. Council, I want to ask you an unrelated question. So one of the issues on appeal is whether the litigation privilege bars contract claims. And as I understand it, the courts of appeal in California are split, and that currently this issue is pending before the California Supreme Court in Doe v. Olson. Should we wait for Doe v. Olson before deciding the issue of whether the litigation privilege bars the counterclaim? Judge Bennett, this court should not wait. Delay would be very harmful in this case, because as you point out, construction is ongoing. My clients need their claims to be able to proceed to trial expeditiously. And I don't think that the California Supreme Court would reach an opinion that says the litigation privilege never applies in the context of breach of contract. Although the question, as I read it from their website, that that they say is under consideration is does the litigation privilege of Section 47, Subdivision B apply to contract claims? And if so, under what circumstances? So I mean, I don't know what they'll ultimately decide. But the way they've posed the question suggests that they might answer it. It does, Your Honor, but it's in all likelihood, the court will reach that sensible standard or rule that the California Courts of Appeal have all reached. And I don't think it is fair to say, Your Honor, that there has been a split in the court of the California Court of Appeal. In fact, they've all said essentially the same thing, which is this. The litigation privilege applies when they're in the breach of contract context, when the contract did not clearly prohibit the speech related conduct, and when applying the privilege would further the public policy behind that privilege. I only saw the one case, the Vivian case, saying that if a party binds itself to agree not to address certain issues, that the court seems like in the other cases, the court will enforce it. And the only case I saw that went the other way was in that Vivian case where there was a very strong public policy issue. Why wouldn't we follow the weight of authority in the California appellate courts if we weren't going to wait for the California Supreme Court to, to deliver its opinion? Judge Ikuda, there are actually three cases we cited, where courts applied the litigation privilege to bar breach of contract claims. That's the Vivian case that you mentioned, the McNair case, and the Park Lane Feldman case. I can't remember those California appellate opinions. They are, Your Honor, all from the California Court of Appeal. And what the court in those cases said is there was a contract that may appear to or look like a party was waiving its rights to say things to go to court to appear in judicial or quasi judicial proceedings. But when we actually examine the language of the contract, it wasn't expressed enough. It just wasn't clear enough to put that party on notice that it couldn't go to court or it couldn't go in front of an official body. And counsel, it's hard for me to see what the good public policy behind a rule like that is that if the parties have agreed to something in a contract, like a settlement agreement, and they do something which would otherwise be permitted by the litigation privilege, but either really expressly or just simply as a normal matter of contract law, they've promised not to do it. It's hard for me to see the public policy of saying, Nope, unless you make it really, really, really clear, as opposed to clear, then we're going to hold its barred, even though you've made the promise. So it's hard for me to see the public policy behind that. Well, you're the reason Judge Bennett, the court say it has to be really, really clear is because we're talking about waiver here. We're talking about waiving an important statutory right that's been around for 150 years in California and 500 years going all the way back to the Queen's bench. So this litigation privilege is a crucial fundamental right of parties at most, you know, freedom of utmost access to the courts. And so in order to waive such an important right, there has to be an unequivocal, clear, compelling, express language, showing that that party said, I will not go and do that thing. And in this case, there is no such And what's the best case that sets out the rule that you're seeking? Which one do you rely on? Your Honor, I think Vivian gives the most express state that effect. It does, Your Honor. Vivian talks about this sort of balancing between wanting to uphold the contract right as Judge Bennett points out, but also wanting to further the public policy purpose of the litigation privilege, which is allowing folks to go to court or quasi judicial proceedings as the Hacienda parties did here, when they went to court, and when they went to the city council hearings. Now, the California courts have recognized, and this is not disputed by a reef, that this sort of conduct falls well within the statutory language of Section 47B, the litigation privilege statute. So there's no fight over whether the litigation privilege actually applies. The fight is over whether there was a waiver. And so that brings me back to my point, there has to be that clear express. Well, there's also a fight about whether it ever applies in a contract case, because certainly, traditionally, the litigation privilege has been applied in tort claims like defamation. And although I haven't gone back and read anything from the King's bench, that would be my guess, that anything over there would be in a tort context, not a contract context. That's right, Your Honor, that it originated in that tort Mr. Cummings, just so I understand this somewhat innocent of California appellate process, but let's assume that the Supreme Court of California doesn't find it your way. And they do so in this case is either under advisement or after it's been resolved, and the case goes back for trial. Do we have to do a redo under those circumstances? Well, I think Judge Woodlock, it would depend on what this court does. If this court stays this case, and doesn't issue an opinion and waits, then of course, it'll see what the California Supreme Court says, and it won't have to guess. That's, that's one aspect. And I understand you don't want to have that happen. So what you want to have happen is that we forge ahead, soldier ahead on this irrespective of what might happen in the Supreme Court of California. And there's no reason to believe is there that the resolution of this case by trial, put to one side settlement, will take place before the California Supreme Court rules is there? It's hard to say, Your Honor, at this point in the deal. Not that everything's hard to say there, it's possible to make an issue of fact out of most anything, I suppose. But the point I guess I'm getting at is that wonder about the exercise of judicial efficiency under these circumstances, when we are essentially awaiting instruction from the Supreme Court of California or would under other circumstances, it probably will take what six months, maybe, if I read the way in which cases flow through the California Supreme Court and the constitutional obligation to take things under submission within 90 days. So what's the harm to you, except delayed gratification, the potential for delayed gratification? Well, I think it circles back to my two points, Judge Woodlock, which is this court in anticipating what the California Supreme Court would say about an issue of state law, this court should be confident that the court will follow what it has said in its own opinions, which is that the litigation privilege applies to, quote, virtually any action or any action except for malicious prosecution. So although the California Supreme Court has not squarely confronted a case with a breach of contract claim, it has used that broad language to say it applies to everything except for malicious prosecution. And because as I point out, there is no split amongst the California courts. Every case that recites from the California Court of Appeal recognizes that the litigation privilege can apply in the breach of contract context. It's just in some cases, they say, oh, there was a clear enough express waiver here and not enough of a strong public policy on the other side that we're going to say the litigation privilege does not apply. So there isn't a split amongst the lower courts, the California Supreme Court will reach the same sensible rule that the lower courts have reached. And Your Honor, the delay does matter. We have our own complaints, which this court should reverse the grant of summary judgment on and allow those claims to proceed to trial so that the Hacienda parties can get the redress that they deserve from this elimination of parking. If the court were inclined, it could potentially sever these two cases, which are separate appeals, and hold on to the litigation privilege issue if it likes. But we don't think the court needs to do so it should be comfortable that the California Supreme Court will come out the way the district court came out in this case. And Your Honors, if there are no questions on further questions on this issue, or the principal appeal, I'm happy to sit down and reserve my time for a bottle. All right. Thank you. You're from the other side. Good afternoon, Your Honors, and may it please the court. Michael Ramey on behalf of the appellees, Reef America and Macy's, and the cross appellant, Reef America. Back in 2008, the parties made a bargain to resolve the disputes that they had about how this shopping center should be used. And in that bargain, Reef said to the Hacienda parties that you can put in your new uses in your building, and we will not oppose it. And they did that. They said we wouldn't oppose some of it. We reserve the right to oppose it if you make material changes, right? I'm sorry, Your Honor, I'm talking about my client, Reef America's promise to the Hacienda parties in the settlement agreement. Remember, the settlement agreement had two components. The consideration was, we agree not to oppose their project to change the use of their building to put in a restaurant, which would have impacted our ability to use the facility in a detrimental way. We agreed not to oppose that. And they got it. They went to the city. We didn't oppose it. And they got that entitlement. In consideration for that promise, they promised that if we built the site plan, they wouldn't oppose it. And in addition, that if we change the site plan, they would only oppose those things which either detrimentally or materially impacted their building. That was the deal the party struck in 2008. We did our part. What's going on in this case is they're claiming that that wasn't the bargain. In fact, it was something different. Well, counsel, you know, the heart. So my first question on this point is, Judge Real wrote, while section six of the settlement agreement states that the agreement does not constitute an amendment to the Correa, the agreement would essentially lose all meaning if the court were to adopt plaintiffs interpretation of this section as preserving their easement rights during construction. So he read that section out of the contract, because it would be, in his view, meaningless. I mean, how the contract would be meaningless? How can that be right? When you have this clear statement in there? How can it be right on summary judgment to basically just say, I'm going to I'm going to read that out of the Well, your honor, I wouldn't characterize as having read it out of the contract, what the what the court was saying. And then we argued below and here on appeal is that there could be a lot of other reasons why someone would want to affirm that contract remains unamended and still exists. After all, this Correa agreement was a recorded document. And we certainly didn't want to have any inference that it's as any that it somehow got erased by the settlement agreement. Well, that might that might be an argument that you could make that the contracts ambiguous and the court should look at extrinsic evidence. But what the contract says is, um, nothing in this agreement shall constitute an amendment to the grant deed or the Correa and the Correa preserves for the plaintiff easement rights and preserves the right to not be unduly disturbed during construction. And it says, again, nothing shall constitute an amendment and judge real read that language out of the contract. It cannot be the case. It cannot both be true. That the that the Correa remain unamended. And Reef America had rights to build as it did a set forth in the settlement agreement. But that's the basic contradiction in the plaintiff's theory, that they're saying, and they've said this all along, and they said it below, that there has been no amendment to the Correa at all. But of course, there's been an amendment in the sense that the party's right, if you want to call it an amendment, the party's rights have been adjusted. They're not the same as they were. If you just looked at the Correa, you have to look at the Correa, along with the with the settlement agreement. And isn't it? And it clearly changes what the parties had under the green. Mr. Roy did Turkey turning to judge Bennett's inquiry. That's not what judge real said. What judge real said is that that's out of the contract. Now it's out of the it's been written out of the arrangements between the parties, it supervenes, that is the settlement agreement supervenes the Korea. And if you took a different position, which I kind of hear you taking, that what we're really talking about here is harmonizing two agreements that remain in place, in a way that is a reasonable adjustment between the parties. Judge real's determination is not that at all, is it? It is, as judge Bennett characterized it, it just, it just said, there's no, this provision is now gone, because you settled it. Well, let's assume for purposes of discussion that that you can read, judge real is saying that the provision is, isn't that the theory, isn't that the fair reading of what he said is that, to the extent that the site agreement, I'm sorry, the settlement agreement conflicts with the Korea, the settlement agreement is what you follow. That doesn't mean that Korea has been amended. Not at all. There's no, there's, there's a distinction between parties adjusting their rights and obligations that they have with one another, and formally amending an agreement. The two are not the same thing. But they amount to the same thing. That is the functional effect of this seems to be the same thing. And that's why I'd like to understand how this is a fair harmonization of those two. Let's assume that I think it should be a fair harmonization for the present purposes. That's this isn't harmony. This is a solo. The, the, there's a fundamental faulty premise that underlies the appellants arguments that I think is what's pushing this concern that you have, that there's supposed to be some notion that reefs quote discretion to change the site plan under the settlement agreement must have some bounds to it. And there, the balance of look for that in the incorporation of the Korea section 9.1 into section six. So your view is there are no your view is there are no bounds. That goes to my question as well in your briefing. You seem to indicate that under the settlement agreement, you had discretion to do whatever you wanted that you could get approval for. So if you had decided to install a nuclear waste site, that would have been permissible under this element agreement. So if you can help me understand whether you think there are limits as to what you could do, or whether you think essentially the Oceania parties agreed that there were no bounds as judge Bennett was saying, help me understand that. Yes, your honor, as I stated previously, the, you have to look at what the promises were. And if you look in this agreement, you will find nowhere where there's a promise from reef, that we will build this site plan. There's no statement that this is the agreed upon go to what the limits are of what you could do. And that's the question that I think judge Bennett and I are asking, are there any limits as to what you could construct or do on that facility? The limits are that they can go forward and oppose the project, as they did, in ways which are consistent with the rights that were given to them. Just like yes or no, are there limits on what we could do on this project on this site? What the limits? Yes, as as dictated by the city. Okay, so only to the extent that you get approval. So as long as you get approval, reef can do whatever it wants on that site. Is that your position? That is our position. And I'll tell you why. The reason is, and this gets lost. Remember, we were, we were settling a dispute back in 2008. Our client and Macy's, Reef America and prime parties to the Korea under Article Two of the Korea, they can determine what gets built in the common areas. That was why we didn't think that they had any legs to stand on back in 2008, tell us what to do. But in order to resolve that dispute, that dispute got resolved. The parties entered into the settlement agreement. Now, we're being, we're being limited on what you do in the common area. When that was the very, so, so, so, so council exhibit G to the settlement agreement on the parking decks, which talks about lot F and what they're going to, what they're going to have. And during stage one, there'll not be 240 parking spaces. Your view is that as long as you decided you're not going to do it in stages, then they're not entitled to anything that's in exhibit G because you've decided you're going to not do it in stages. Is that right? No, that's wrong. Your honor. There is the 240 aspect. I think it's, it's either the first or second item that's listed in a very long list of things that we second are able to do. But the other stuff remains. Now it turned out that most of the other stuff is not at the time that the district court made the decisions were, were right. None of that stuff that ever happened. So the district court never reached it, but, but the answer to the question directly that, that only the 240 space provision is, is impacted by our decision, which, which the settlement agreement gave us to do this, not in stages. And by the way, doing it, not in stages, but just getting it done, stop, shorten the project by over half. We're going to be done with the North deck by the spring. So is it correct? I'm sorry, judge, you could, is it correct? That lot F is going to be gone forever. Lot F will be in part replaced by the North deck, but that was always the case, even under the site plan that the plaintiff of the, uh, uh, appellate's had agreed to, there was going to be a structure erected in lot F. The only question is how big was that structure was going to be? How close was it going to be to the Asiana building and how much time would it take and how much parking would be available during the construction? So under your reading of the settlement agreement, I think, um, was judge Woodlock correct? Because if in fact, under the settlement agreement, you can make any changes to the property that you want, then the, um, the Korea, the harmonization, I guess, with the Korea is that it has no application at all. They have, um, ASEAN parties have no rights under it because you can do what you can do whatever I want. Am I understanding your position correctly? No, that's not quite correct, your honor. Because remember the Korea deals with a lot of different aspects that go far beyond the issues that we're talking about today. I know, but we're looking at the, um, the issues regarding the, the easement in the common area and section 9.1, which is the, with their rights when there's construction. And from what I understood your argument to be is that those rights ease to exist under the settlement agreement because the settlement authorizes for you to do whatever wants in the common area. Am I misunderstanding your position? No, the settlement agreement does not put any restrictions on REIF's ability to amend the site plan. It, there is none. And in fact, it says that expressly, that there is no... To my question is yes, it is eliminated. Their rights under the Korea with respect to easement rights are eliminated by the settlement agreement. No, no, because in this particular instance, our position always was, and we resolved this in 2008, that no such rights existed. So, so the language in the settlement agreement preserving their rights under the Korea was, was meaningless because they had no such rights. Is that what your position is? In the section six language regarding the no amendment? Correct. It has meaning because there's a lot of other stuff in the Korea that other than what we're just talking about. But, but counsel, if they have no rights, then allowing them to pursue this, except for the litigation costs won't harm you because you'll ultimately win when they, if we reverse and allow them to pursue claims under the Korea because they have none. Well, we certainly, if that unfortunately happens, we're back in front of trial court and we're litigating their claims against us under the Korea and under the settlement agreement, we will argue that under the Korea, they have no, they have no rights because they're not a prime party to dictate what the uses are in the common area. We never made that argument below. We've actually made the argument in opposition to the preliminary injunction motion that was brought. But for purposes of our summary judgment motion, we were thinking, well, we've solved, we've resolved that issue. The question is the settlement agreement, what does it mean? And that clearly bars this claim. And that was why we just focused on that and not trying to also dredge up a group of contentions that we thought we had resolved in 2008. You have the matter. I'm sorry, Judge Woodlock, please go ahead. Brief point as a matter of procedure, then your position is that we cannot construe section 9.1 at this point, but with a recognition that some point somebody may have to. Is that it? I'm sorry, I missed that, Your Honor. I missed the first part of it. I'm asking whether or not the easement rights that you say they don't have anymore and never had that may reside in section 9.1 are matters that cannot be resolved by this court at this time in its resolution of this case. We just have to wait around or you have to wait around until it's procedurally teed up properly. Because there's no final determination about the easement rights here. Correct? No, I think that there has been a final determination regarding the easement rights as it relates to the site the project is being done. And that was adjusted in the settlement No, no, I mean, a judicial determination of the application the continued application of Korea hasn't been done yet, right? Procedurally, you had some issues with temporary or with the preliminary injunction, and then you went on to a different kind of summary judgment. Well, I would construe Judge Real's decision granting our motion on our against their Korea claims as being an adjudication of the rights that the parties have as it relates to the project. So then we're in a position now to construe the Korea that Judge Bennett pointed out seems to have been written out of the Korea by Judge Real. Is it that are we in that posture now? I would think I would think that if you if you feel like you need in order to understand what the parties are doing in the settlement agreement, then you would, you would take a look at the Korea. I'd be interested in your position, counsel, on the litigation privilege issue, whether you think we should wait for the decision in Doe. The the it is it is it is probable that the California Supreme Court will will reach and rule that that the litigation privilege shouldn't apply to contract for all the reasons that you articulate, but I don't think that this case is so different than the few cases that the courts have found that the litigation privilege does work on contract claims that it's it seems like it's waiting around for, you know, decide whether some outlier is is included or not. Those cases is have to deal with fairly significant public danger issues of public danger has to do with reporting to public authorities about bus drivers who shouldn't be driving school, school kids around and things. Counsel is your is your is your bottom line when press that you would agree with your colleague that we should proceed to decide it and not wait for the Court of Appeal or not wait for the California Supreme Court. I don't think you need to wait. Thank you. On the issues of litigation privileges to spin it out a you don't you could just agree with Judge Reals interpretation of California law that it's got this two part test under Vivian has to be clear and has to be, you know, pushing forward the policies underlying the litigation privilege problem, even if you would, if you dealt with that issue is that you would run up against the fact that there were many, many things that the parties did that simply were not allowed by the agreement clearly or that had nothing to do with the thing that Judge Reals focused on, which is the material or detrimental changes that was made to the site agreement. There were things that were done that had nothing to do with the Hacienda building, but still they opposed it. And therefore there is no one clarity that needs to be worried about. It was a clear contract. They said they won't oppose it. And they did. And if their opposition is not considered to be opposition, I don't know what would be. And it looks like I've run out of time. Thank you. Unless you have any more questions. We have your argument and you have some time for rebuttal. Thank you, Judge. I want to start your honors with Judge Bennett's first question, which I think really gets to the heart of this matter. Judge Bennett said, how could the district court have read Section 6 out of the contract, implying you just can't do that. And that's right. Judge Bennett, you can't. The California Supreme Court is clear and it has said, quote, courts must interpret the contractual language to give force and effect to every provision and avoid an interpretation that renders some clauses nugatory, inoperative or meaningless. And that's what the district court admitted it was doing when it said, I'm just not going to give any force to Section 6. So Reeve says that you have no easement rights under the Korea. Is that wrong? That's absolutely wrong, Judge Hakuta. The easement rights come from Section 2.1 of the Korea, where it says that the parties are entitled to use non-exclusive easements over the common area of their respective tract for the passage and accommodation of pedestrians and vehicles on such portions of the common areas that are set aside and authorized for that use. Please say you're not the right party. That's only applicable to certain primary parties. That's also not correct, Judge Hakuta. The Hacienda parties were, their predecessor was a party to this agreement. And the Korea says it applies to all successor parties. We are not a prime party as that term is defined. But the easement rights are granted to any party, not just the prime parties. The prime parties are the special parties that have certain rights to make changes, you know, without having to bring the other parties in. But that is not, easement rights or parking rights are not one of those changes that can be made without the buy-in of the Hacienda parties. And there's never been an argument from Reeve that they could make changes without getting the Hacienda parties buy-in. And so those Korea rights came from Section 2.1. They're elaborated on in Section 9.1, where already an easement right brings with it under the law, the right against unreasonable interference. That's what the law says about easements. But the Korea went even further to say that even during construction, where there's a temporary condition that's going to be blocking that common area, you still have to not unreasonably interfere with another party's use occupancy. So, so counsel, I think to me, I mean, putting aside the question of who's a party to the Korea, Section 9.1 clearly talks about ongoing construction. Why do you think Section 9.1 would, would cover the final result after construction, i.e. what you ended up with after construction was done, as opposed to interference with your ability to use and enjoy while construction was going on? Where in the Korea or 9.1, would it give you a right to bring a claim based on what you ended up with after construction was done? So a couple of points on that judgment. First, I don't think the word construction in that section can be read so narrowly as to only to apply to the staging of equipment or fences blocking off things. I think construction naturally is going to mean the construction activities and the actual construction, the buildings that are constructed. And second judge Bennett is the right. I'm sorry, you need to point me to language. The title is general construction requirements. It's 9.1 interference with construction, and then it goes with construction, barricades, plans, and schedules. You have to show me something in 9.1 that would suggest that could be, that it could be breached by not something that's during construction by that you ended up with 200 spaces instead of 400 spaces. Your honor, the language is in section 9.1. It starts by saying each party severally agrees to perform its respective work. And then I'm going to jump down to little, I little, I little, I so as not to unreasonably interfere with the occupancy or enjoyment of the remainder of the shopping center, but it agrees to perform its work. So as not to unreasonably interfere, right. And the building of a building through construction is the performance of work. But even if your honor, the court isn't convinced that this particular language grants the Hacienda parties a right to challenge the end product. The Korea itself does the grant of that easement right at the beginning of the Korea and section 2.1 brings with it a right under law to challenge unreasonable interference. When a party owns an easement, right, it can sue when that easement right is unreasonably being interfered with. And so we don't rely exclusively on section 9.1. Your honor, judge Bennett to your question, uh, to reef about whether there are any bounds to a reef discretion and, and counsel suggested there are essentially no bounds. Of course, there have to be balanced. And the language of the contract makes that clear when it says that nothing in this agreement shall be an amendment to the So the way you harmonize the provisions is you recognize that reef has some discretion to make amendments to the plans, but it can't make such drastic and significant changes as to then unreasonably interfere with the Hacienda parties easement rights. If you were to read it the other way, it would mean as judge Acuda pointed out with that nuclear waste facility hypothetical, it would mean that reef could change its plans that were agreed to by the parties in 2008 and build something entirely different. And the Hacienda parties would have no avenue for recourse. That is what reef is saying here. It's saying we could have built a football stadium in your parking lot. We could have put a nuclear waste facility there and you would not have been able to challenge that as a violation of your easement rights. The just stating those hypotheticals show how extreme in nature reef's argument is and how it completely ignores its  Uh, your honors, uh, judge Bennett pointed out that, uh, the contract says that 240 spaces have to be maintained during construction of the north deck and counsel for reef said during, during phase one, right? Your honor. But, but this is phase one. If they're building it in just one phase and not two phases, then of course we're in phase one. And even if the court wasn't convinced that the failure to provide those spaces violates the technical language in the contract, it's still a violation of the good faith and fair dealing covenant that is attached to every contract here. Those 240 spaces were promised because both parties recognized there would be temporary reductions in parking during construction and the Hacienda party needed places for their customers to park. And so we said, okay, we'll maintain some spots for you. Now for you, reef is saying we will not maintain any for you. So that is doing something that was not contemplated by the parties. It breaches the duty of good faith and fair dealing. So regardless of whether the court thinks there's a classic breach of contract there, there's at least a breach of the covenant of good faith and fair dealing. Um, finally, your honors, uh, counsel for reef argued that the contract does clearly prohibit the activity that the Hacienda parties engaged in, and this is relevant to reef's counter claims. It did not clearly prohibit that activity as we've already discussed. It does not say that they cannot make challenges to a changed plan, a plan that wipes out 140 spaces in a lot of wipes out 240 spaces during construction. We've cannot point to a single clause in the agreement that clearly expressly prohibits the Hacienda parties from raising their hand and saying, Hey, we've lost out on all our parking help us. And because the contract did not clearly prohibit the Hacienda parties from going to court or going to the city council. And because there's a strong public interest in a party being able to assert its rights in those forums, the litigation privilege must apply. This court should reverse the district court's order, granting summary judgment for reef on the complaint. It should affirm the district court's order, granting summary judgment for the plaintiffs on the counter claim, and it should affirm the order on the attorney's fees. Thank you, your honors. All right. We thank both sides for their argument in the case of 3500 Sepulveda LLC versus Macy's and Reef America. Reef 2 is submitted and we're adjourned for this session. Thank you. This court for this session stands adjourned.
judges: Ikuta, Woodlock, Bennett